UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,          :
                                   :
          -v-                      :          OPINION
                                   :
DOUG WHITMAN,                      :          12 Cr. 125 (JSR)
                                   :
               Defendant.          :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

          On August 21, 2012, following a three-week trial, a
jury convicted defendant Doug Whitman of two counts of conspiracy
to commit insider trading and two counts of substantive insider
trading in violation of the federal securities laws.
Specifically, the counts charged that Mr. Whitman traded or
agreed to trade on material inside information that he received
from tippees who had, in turn, obtained the information from
inside employees at Polycom, Inc., Google, Inc., and Marvell
Technology, Inc. In connection with instructing the jury as to
these charges, the Court confronted three interrelated issues as
to which the law was unsettled. Those issues were:

          (1) Whether in a criminal prosecution under the federal
securities laws, the scope of an employee's duty to keep material
non-public information confidential is defined by state or
federal law?

          (2) Whether a person who receives such information from
someone outside the company must, to be criminally liable for
trading on such information, know that the information was
originally obtained from an insider who not only breached a duty

of confidentiality in disclosing such information but also did so in exchange for some personal benefit?

(3) Whether even a secondary tippee like Mr. Whitman must, in order to be criminally liable, have a specific intent to defraud the company from which the information emanates of the confidentiality of that information?

After receiving written submissions and oral arguments culminating in a three-hour charging conference on August 14, 2012, the Court resolved the questions as reflected in Instructions 10 and 11 of the Court's jury charge. See United States v. Whitman, 12 Cr. 125 (JSR), D.E. 102 (S.D.N.Y. 2012) (Ct. Ex. 1) (Court's instructions of law to the jury). Although the Court stated its reasons for these rulings from the bench, this Opinion will serve to further amplify and elaborate the Court's reasoning.

By way of background, most insider trading prosecutions (outside the context of tender offers) allege willful violations of Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, which was promulgated in 1942 by the Securities and Exchange Commission ("SEC") pursuant to Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b). See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976). Rule 10b-5, in turn, was loosely modeled on the federal mail fraud statute, 18 U.S.C. § 1341, enacted in 1872. See Robert A. Prentice, Scheme Liability: Does It Have a

2

*Future After Stoneridge?*, 2009 Wisc. L. Rev. 351, 361, 365 &
nn.54-56, 77 (Rule 10b-5 was virtually copied from section 17(a)
of the Securities Act of 1933, which in turn was modeled,
especially in subdivision (a) of the Rule, on the federal mail
fraud statute).

Initially, only civil insider trading cases were
brought under Rule 10b-5, first as administrative actions, see
Cady, Roberts & Co., 40 S.E.C. 907 (1961), and then as SEC
enforcement actions, see S.E.C. v. Texas Gulf Sulphur Co., 401
F.2d 833 (2d Cir. 1968) (en banc). Such cases typically involved
executives of companies who, upon learning of confidential
information about their companies that would cause its stock
price to rise, purchased shares from their own shareholders
before the information was publicly announced, thereby breaching
their fiduciary duty to their own shareholders. For example, in
Texas Gulf Sulphur, the defendants, insiders of a mining company,
upon learning that the company had just discovered 25 million
tons of valuable mineral ore in eastern Canada, purchased stock
and call options in the company before the discovery was
publically announced, thereby violating Rule 10b-5. Id. at 843-
52.

Soon, however, the cases were extended to situations
where an insider in possession of material nonpublic information
did not himself trade but disclosed the information to an

outsider (a "tippee") who then traded on the basis of the information before it was publicly disclosed. Eventually, the Supreme Court confronted this situation, in Dirks v. S.E.C., 463 U.S. 646 (1983), where it held that such a tippee assumes a fiduciary duty to shareholders of a public company not to trade on material nonpublic information if (a) the tipper has breached his fiduciary duty to the company and its shareholders by disclosing such information to the tippee in return for some personal benefit and (b) the tippee knows or should have known of the breach. Id. at 654-55. Thus, in Dirks, the defendant, Raymond Dirks, an officer of a New York broker-dealer, received information from Ronald Secrist, a "whistleblower" who disclosed inside information about fraud at his former company, Equity Funding of America. Id. at 649. Dirks did not himself trade on this information, but he repeated the information to clients of his company, who thereupon liquidated their holdings. Id. at 649-50. The SEC censured Dirks, but the Supreme Court reversed, holding that because Secrist, the tipper, did not disclose the information for his personal benefit, there was no breach of fiduciary duty (in the sense of self-dealing at the shareholders' expense), and thus there was no derivative breach by Dirks, the immediate tippee (let alone by the secondary tippees, the clients). Id. at 662.

4

Collectively, the approaches described above are referred to as the "classical" theories of insider trading because they involve breaches, whether direct or derivative, of duties to shareholders of the insider's company. SEC v. Obus, 693 F.3d 276, 284 (2d Cir. 2012). However, around the same time that Dirks was proceeding through the courts, the first criminal insider trading cases were being brought, often involving lower-level employees who tipped or traded on the basis of market-sensitive information that they purloined from their employers but that pertained to the stock, not of their employers' companies, but of other companies. See Chiarella v. United States, 445 U.S. 222 (1980); Carpenter v. United States, 484 U.S. 19 (1987); United States v. O'Hagan, 521 U.S. 642 (1997). For example, in Chiarella, which preceded Dirks, a low-level employee at a financial printing company misappropriated his company's confidential information concerning upcoming corporate takeovers involving other companies and thus was able to purchase stock in advance of the takeovers, to his profit. Since in these cases the employee was not purchasing securities from shareholders of his employer, it took awhile for a viable legal theory of these prosecutions to emerge -- indeed, the conviction in Chiarella was reversed -- but eventually the defendants' undisclosed embezzlement or "misappropriation" of market-sensitive confidential information from their employers was held to be a

fraud on their employers that violated not only the mail fraud statute, see Carpenter, 484 U.S. at 25-28, but Rule 10b-5 as well, see O'Hagan, 521 U.S. at 665-66.

As this thumbnail history illustrates, the prohibition of insider trading in the United States has developed in a somewhat ad hoc manner, leaving many unanswered questions.[1] The instant case -- which was prosecuted under a modified "Dirks" approach[2] -- illustrates the point. Under this approach, liability exists if the tipper breaches a fiduciary-like duty of

---

[1] Other nations have proposed and, in some cases, enacted laws of general applicability against insider trading, see, e.g., European Commission, Proposal for a Regulation of the European Parliament and of the Council on Insider Dealing and Market Manipulation (Market Abuse), at 13, 30-33 COM (2011) 651 final (Oct. 20, 2011) (clarifying European Union ("EU") regulations on insider trading and proposing EU directive for all EU countries to add criminal sanctions for insider trading in addition to existing administrative sanctions). Congress, however, has never done so, partly because the SEC has generally opposed such proposals on the ground that that any statutory definition of illegal insider trading would inevitably create "loopholes" that would be eventually utilized in much the same way that the tax code generates tax "dodges" that are frequently successful. However, as this very case demonstrates, the judge-made law of insider trading, however flexible, can create potential gaps in coverage that are the functional equivalent of legislative loopholes.

[2] Perhaps in an effort to touch all bases, the Indictment in this case alleges that the insiders tipped their immediate tippees "in violation of their duties of trust and confidence that they owed to [a given company] and [the company's] shareholders and for personal benefit," e.g., Indictment ¶ 5, and that the defendant knew that the information "was obtained in violation of duties of trust and confidence that the [insider] owed to [the insider's company] and [that company's] shareholders." Nevertheless, in various submissions made during trial, the Government made plain that it was primarily alleging a Dirks-based theory of liability.

trust and confidence owed to his employer and its shareholders to keep confidential the material nonpublic information that the tipper discloses to his tippee in return for a personal benefit, knowing that the tippee may trade on the information. The first question that this poses is, from whence does this duty arise?

This should not be confused with the question of what is material nonpublic information. What is "nonpublic" or "confidential" information is largely a factual issue, turning on such factors as written company policies, employee training, measures the employer has taken to guard the information's secrecy, the extent to which the information is known outside the employer's place of business, and the ways in which other employees may access and use the information. United States v. Mahaffy, No. 09-5349-cr, 2012 WL 3125209, at *17 n.14 (2d Cir. Aug. 2, 2012); see also U.S. v. Royer, 549 F.3d 886 (2d Cir. 2008). What is "material" information, though a mixed question of fact and law, is necessarily defined by federal law, because materiality relates in this context to what is required by federal securities laws to be disclosed and the very purpose of those laws is to set federal standards and requirements of disclosure in securities transactions. Thus, the relevant precedents deal with this issue as a matter of federal law and hold that a fact is "material" in this context if there is "a substantial likelihood that the disclosure of the omitted fact

would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made
available." Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988)
(quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449
(1976)). See also United States v. Contorinis, 692 F.3d 136 (2d
Cir. 2012).

        But the previously unanswered question the Court here
had to confront is what law gives rise to an employee's duty not
to disclose to an outsider material nonpublic information. If it
is simply a contractual duty, it seemingly would not support a
fraud prosecution, since a breach of contract does not
necessarily involve any misrepresentation. Cf. S.E.C. v. Cuban,
634 F. Supp. 2d 713, 724-26 (N.D. Tex. 2009) (holding that
although contract may in certain circumstances give rise to
misappropriation liability, the agreement "must contain more than
a promise of confidentiality"), rev'd, 620 F.3d 551 (5th Cir.
2010). Rather, the duty must be of the kind that requires the
employee, if he breaches the duty, to disclose the breach -- the
failure to do so thereby constituting the misrepresentation that
is an essential element of fraud.

        This kind of duty is sometimes referred to as a
"fiduciary" duty. For example, in Dirks, the Supreme Court
described the liability of a tippee as derived from the tipper's
"fiduciary" duty to the shareholders of his company either to

                                8

disclose material nonpublic information before trading with them
on the basis of that information or else abstain from such
trading. Dirks, 463 U.S. at 659-60. "A tippee assumes a fiduciary
duty to the shareholders of a corporation not to trade on
material nonpublic information only when the insider has breached
his fiduciary duty to the shareholders by disclosing the
information to the tippee and the tippee knows or should know
that there has been a breach." Id. But, as Justice Frankfurter
famously noted in S.E.C. v. Chenery Corp., 318 U.S. 80, 85-86
(1943), "[t]o say that a man is a fiduciary only begins the
analysis; it gives direction to further inquiry. To whom is he a
fiduciary? What obligations does he owe as a fiduciary? In what
respect has he failed to discharge these obligations? And what
are the consequences of his deviation from duty?" Moreover, as
the Supreme Court made clear in Chiarella, the duty to disclose
or abstain may arise from "a fiduciary or other similar relation
of trust and confidence." Chiarella, 445 U.S. at 228 (emphasis
supplied) -- making the need for clarity as to what duty is
involved and what its requirements are even more pertinent. See
also United States v. Chestman, 947 F.2d 551, 567-70 (2d Cir.
1991).

But, whether labeled a "fiduciary" duty, or fiduciary-
like "duty of trust and confidence," or whatever, the initial
question remains: what is the source of this duty? Defendant here

9

argues that fiduciary and quasi-fiduciary duties are normally a matter of state law, and that the relevant state here is California, where the tippers and their employers were located.[3] According to defendants, moreover, California's law applies the relevant fiduciary duty of confidentiality only to upper-level employees, which, defendant claims, the tippers here were not. The Government, for its part, disagrees that the relevant California duty applies only to upper-level employees or, even if it does, that the tippers here were of a lower level.[4] But the

---

[3] Cf. Stephen M. Bainbridge, Incorporating State Law Fiduciary Duties into the Federal Insider Trading Prohibition, 52 Wash. & Lee L. Rev. 1189 (1995) (arguing that the prohibition against insider trading is best justified on a theory of protecting property rights in confidentiality, which should be determined with reference to state law). Still another possibility -- though not advanced by either side here -- is that since, under Dirks, the fiduciary duty is ultimately a duty to the shareholders, the relevant law is the law of the state of incorporation, which for two of the three companies here involved -- Google and Polycom -- is Delaware, see Google Inc. Annual Report (Form 10-K), at 1 (Jan. 26, 2012); Polycom, Inc. Annual Report (Form 10-K), at 1 (Feb. 2, 2012), and for Marvell Technology, is Bermuda. Marvell Technology Group Ltd. Annual Report (Form 10-K), at 1 (Mar. 27, 2012); see also Bainbridge, 52 Wash. & Lee L. Rev. at 1267 n.320 ("Long-standing choice-of-law rules direct that questions of breaches of fiduciary duty by corporate officers and directors are governed by the law of the state of incorporation." (quoting Restatement (Second) of Conflicts of Law § 309 (1969))).

[4] The Government also argues that, even accepting that California does not impose the same general fiduciary obligations on lower-level employees that New York would place, California nevertheless has adopted the specific Restatement of Agency rule, applicable to all employees, that "[a]n agent has a duty . . . not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party." Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC, 162 Cal. App. 4th 858, 888 n.8 (2008) (quoting Restatement (Third) of

10

Court need not reach these questions of California (or Delaware or Bermuda) law, because it agrees with the Government's alternate position, that the duty in question is imposed and defined by federal law.

To begin with, Dirks, and indeed all the Supreme Court cases dealing with insider trading, have implicitly assumed that the relevant fiduciary duty is a matter of federal common law, for they have described it and defined it without ever referencing state law. See Dirks, 463 U.S. 646; Chiarella, 445 U.S. 222; Carpenter, 484 U.S. 19; O'Hagan, 521 U.S. 642; see also A.C. Pritchard, Justice Lewis F. Powell, Jr., and the Counterrevolution in the Federal Securities Laws, 52 Duke L.J. 841, 930-31 & nn.540-41 (2003) (arguing, based on review of the notes of Justice Powell and interviews with his former clerks, that Justice Powell, the author of Dirks and Chiarella, saw Rule 10b-5 jurisprudence as a species of federal common law). Defendant, indeed, has failed to point to a single case where any federal court has expressly held that the duty was defined by state law. Cf. Cuban, 634 F. Supp. 2d at 721 (noting SEC's argument that "no federal court has relied exclusively on state law to determine whether a duty sufficient to support misappropriation theory liability exists").

---

Agency § 8.07).

Second, nothing in the underlying legislation -- the Securities Exchange Act of 1934 -- suggests that its requirements were designed to vary from state to state.[5] On the contrary, its purpose was to provide full, and uniform, disclosure throughout the national securities markets. See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 235 (2d Cir. 1974) ("As we have stated time and again, the purpose behind Section 10(b) and Rule 10b-5 is to protect the investing public and to secure fair dealing in the securities markets by promoting full disclosure of inside information so that an informed judgment can be made by all investors who trade in such markets."). To be sure, this does not mean that Rule 10b-5 can serve as a device for overriding state law on such matters of allocution of governing powers within a corporation, see Kamen v. Kemper Fin. Servs., 500 U.S. 90, 108 (1991), or other matters of internal corporate regulation, see Santa Fe Indus. v. Green, 430 U.S. 462, 479 (1977). But where, as here, the issue is a duty to disclose, federal law must be paramount or the goal of the 1934 Act to assure transparency in the markets would be severely compromised depending on the vagaries of individual states' laws and policies.

---

[5] Similarly, the SEC's rules promulgated under the 1934 Act are uniform throughout the United States. In particular, in connection with the closely-related question of what constitutes a duty of trust and confidence under the misappropriation theory of insider trading, the SEC has promulgated a rule -- Rule 10b5-2

12

Third, this does not mean that general principles of
state fiduciary law -- in many cases grounded in centuries-old
common law principles -- are not helpful guidance for determining
the parameters of the applicable federal common law to be applied
here, but only that idiosyncratic differences between the laws of
various states cannot be allowed to trump the federal interest in
combating insider trading. Particularly instructive in this
regard is United States v. Chestman, 947 F.2d 551 (2d Cir. 1991),
where one of the questions was whether marriage created the
fiduciary relationship necessary to impose Rule 10b-5 criminal
liability for insider trading. Even though marriage, and the
general duties created thereby, are classically a matter of state
law, the Second Circuit, in determining how these duties pertain
to insider trading, took a uniform approach. Thus, it held that
"[w]e take our cues as to what is required to create the
requisite relationship [both] from the securities fraud
precedents and the [general] common law." Id. at 568 (citing
Chiarella, 445 U.S. at 227-30).

Further to this purpose, as noted above, the SEC
subsequently propounded Rule 10b5-2, which defined the duty of
trust and confidence in Chestman-like situations without any
reference to state law or any suggestion that defining such a

---

- that is uniform throughout the United States.

duty in this context was anything other than a federal
prerogative.

        Accordingly, in instructing the jury in the instant
case, the Court framed its instructions in terms of a federal
common law duty of trust and confidence, derived from the federal
insider-trading cases and owed, so far as disclosure of market-
sensitive information is concerned, by all employees to their
employers and shareholders. But this then led to a second
question: what did a secondary tippee, like Mr. Whitman, who
obtained his information from the direct tippees, have to know
about the tipper's breach of duty to be criminally liable? The
Government argued that it needed only to show that the defendant
knew (or recklessly disregarded) that the information he was
obtaining was an unauthorized disclosure by some inside tipper,
but not that he also knew of any benefit provided to the tipper,
citing United States v. Falcone, 257 F.3d 226, 234 (2d Cir.
2001); United States v. Mylett, 97 F.3d 663, 668 (2d Cir. 1996);
and United States v. Libera, 989 F.2d 596, 600 (2d Cir. 1993).
But Falcone, Mylett, and Libera were all misappropriation cases,
"the purpose . . . of which is to protect property rights in
information." Libera, 989 F.2d at 600. Thus, the tippee's
knowledge that disclosure of the inside information was
unauthorized is sufficient for liability in a misappropriation
case. By contrast, the purpose of a prosecution premised, as

                              14

here, on a <u>Dirks</u> approach is to protect shareholders against self-dealing by an insider who exploits for his own gain the duty of confidentiality he owes to his company and its shareholders. The element of self-dealing, in the form of a personal benefit -- whether immediate or anticipated, and whether substantial or very modest -- must be present.[6]

Accordingly, if the only way to know whether the tipper is violating the law is to know whether the tipper is anticipating something in return for the unauthorized disclosure, then the tippee must have knowledge that such self-dealing occurred, for, without such a knowledge requirement, the tippee does not know if there has been an "improper" disclosure of inside information. See <u>United States v. Rajaratnam</u>, 802 F. Supp. 2d 491, 498-99 (S.D.N.Y. 2011); <u>State Teachers Ret. Board v. Fluor Corp.</u>, 592 F. Supp. 592, 594 (S.D.N.Y. 1984).

On the other hand, there is no reason to require that the tippee know the details of the benefit provided; it is sufficient if he understands that some benefit, however modest,

---

[6] For the view, however, that personal benefit is also a requirement of liability under the misappropriation theory, <u>see</u> <u>SEC v. Yun</u>, 327 F.3d 1263 (11th Cir. 2003). The Second Circuit's recent decision in <u>Obus</u>, decided after the trial of the instant case, is also somewhat Delphic on this score, suggesting, on the one hand, that even in a civil misappropriation case, the tipper is liable only if he "received a personal benefit from the tip," but, on the other hand, that tippee liability, even in a civil case, requires that "the tippee knew or had reason to know . . . that the information was obtained through the tipper's breach." <u>Obus</u>, 693 F.3d at 289.

is being provided in return for the information. Accordingly, in the instant case, the Court instructed the jury as follows:

> [O]n or about the date alleged, Mr. Whitman engaged in an "insider trading" scheme, in that he traded in the securities of the company identified in [the specified] count on the basis of material nonpublic information about the company, <u>knowing</u> that the information had been obtained from an insider of the company who had provided the information in violation of that insider's duty of trust and confidence and in exchange for, or in anticipation of a personal benefit.
>
> . . .
>
> As to the defendant's knowledge that the insider has breached the insider's duty of trust and confidentiality in return for some actual or anticipated benefit, it is not necessary that Mr. Whitman know the specific confidentiality rules of a given company or the specific benefit given or anticipated by the insider in return for disclosure of inside information; rather, it is sufficient that the defendant had a general understanding that the insider was improperly disclosing inside information for personal benefit.

Ct. Ex. 1 at 15, 17 (emphasis supplied).

At the time, the Government protested that such a standard would create loopholes for tippees to insulate themselves from liability. But the instant case did not itself support such a fear. Quite aside from the fact that very little in the way of a "benefit" needed to be shown,[7] the Government in fact had no difficulty proving such knowledge in this case.

---

[7] As the Court instructed the jury, the benefit does not need to be financial or tangible in nature; it could include, for example, maintaining a useful networking contact, improving the reputation or power within the company, obtaining future financial benefits, or just maintaining or furthering a friendship. Ct. Ex. 1 at 17. See, e.g., Obus at 285.

16

Indeed, Mr. Whitman's own words, in recorded conversations, indicated that he not only was well aware of the benefit requirement, but also was confident that the tippers here were receiving actual or anticipated benefits. Moreover, where appropriate (as here), the Government is entitled to a "willful blindness" or "conscious avoidance" instruction to the jury on the issue of such knowledge. See Obus, 693 at 287. See also Ct. Ex. 1 at 17.

Nevertheless, one can imagine cases where a remote tippee's knowledge that the tipper was receiving some sort of benefit might be difficult to prove. If, however, this is an unfortunate "loophole," it is a product of the topsy-turvy like way the law of insider trading has developed in the courts and cannot be cured short of legislation.

The final question presented by the charge to the jury in the instant case was whether criminal insider trading in violation of Rule 10b-5 requires "specific intent," and, if so, in what sense. Ultimately, the Court instructed the jury that, in order to convict, the Government had to prove, inter alia, that the defendant "acted knowingly, willfully, and with an intent to defraud," and that "an intent to defraud" meant "an intent to deprive the company in question of the confidentiality of its information." Ct. Ex. 1 at 15-16, 18.

17

This charge is substantively identical to the charge this Court gave to the jury in the insider trading case of United States v. Gupta, 11 Cr. 907 (JSR), D.E. 102, at 16-17 (S.D.N.Y. June 6, 2012). In Gupta, the Government did not object to the Court's specific intent charge, and, in the instant case, the Government ultimately withdrew its objection to charging specific intent. See Trial Tr. dated Aug. 14, 2012, at 2333 ("We are OK with this as it is."). Despite the Government's eventual acquiescence to the Court's charge, the Government originally submitted a proposed jury charge that did not charge specific intent, as well as several briefs objecting to an instruction describing insider trading as a specific intent crime. Accordingly, the Court here addresses the issue.

As noted, the language of Rule 10b-5, and especially subdivision (a) thereunder, is derived from the federal mail fraud statute (which, in turn, is derived from English law going back several hundred years). See 17 C.F.R. § 240.10b-5(a) (requiring "scheme, or artifice to defraud"); 18 U.S.C. § 1341 (same). Thus, as the Supreme Court has noted, mail fraud precedent is "a particularly apt source of guidance" for interpreting securities fraud under Rule 10b-5. O'Hagan, 521 U.S. at 654 (internal quotation marks omitted).

It is axiomatic that proof of mail fraud requires specific intent in the sense of intent to harm. Indeed, in this

Circuit, the Government in a mail fraud case must prove more than just that the defendant intentionally committed the conduct that was fraudulent or that he knew it was deceptive; the Government must also show that the defendant knew that his conduct was intended to harm the victim, by depriving him of money or property. United States v. Regent Office Supply Co., 421 F.2d 1174, 1180 (2d Cir. 1970).

The intent specified by Congress for criminal liability for violations of the Securities Exchange Act of 1934 is "willfully." 15 U.S.C. § 78ff(a). "Willful" is a word of many meanings, but it takes its meaning from the specific violation charged. United States v. Bishop, 412 U.S. 346, 352 (1973). So for violations of certain of the provisions of the 1934 Act not sounding in fraud per se, it might be plausible to suggest that the defendant need not have a specific intent to defraud but only general mens rea. See, e.g., United States v. Peltz, 433 F.2d 48, 55 (2d Cir. 1970) (holding, in context of Rule 10a-1(a) -- the "downtick" rule -- that the defendant need only realize he is doing a "wrongful" act, namely, by telling brokers he was "long" on a stock when he knew he was not). But where, as in this case, the Government charges a scheme to defraud under subdivision (a) of Rule 10b-5, proving specific intent to defraud is necessary. Indeed, were it otherwise, an insider trading defendant charged, in virtually identical words, with violating both the mail fraud

statute and Rule 10b-5, could be convicted of the latter but acquitted of the former, even though the latter is a specialized subspecies of the former. Cf. United States v. Tarallo, 380 F.3d 1174, 1181 (9th Cir. 2004) ("[L]ike[] [mail fraud], a defendant may be convicted of committing securities fraud only if the government proves specific intent to defraud, mislead, or deceive." (emphasis supplied)).

Nonetheless, there is authority to the contrary, see generally Bruce A. Hiler, Dirks v. SEC - A Study in Cause and Effect, 43 Md. L. Rev. 292, 317 & n.105 (1985) (collecting cases). In the Second Circuit, however, the only directly contrary authority is the Second Circuit's opinion in United States v. Chiarella, 588 F.2d 1358 (2d Cir. 1978), rev'd, 445 U.S. 1108, where the Court of Appeals rejected Chiarella's argument that the Government needed to prove a specific intent to defraud. The Court of Appeals noted that although in Ernst & Ernst v. Hochfelder, 425 U.S. at 197, 201 (1976), the Supreme Court had required some element of scienter, which it defined as "knowing and intentional misconduct" (in contrast to mere negligence), it did not impose a specific intent scienter standard. Chiarella, 588 F.2d at 1370. The District Court had charged the jury with finding that Chiarella had engaged in "knowingly wrongful" misconduct, and the Court of Appeals affirmed the conviction. Id. at 1371.

Although this aspect of the Second Circuit's decision was curious -- since it rested on the dubious proposition that the scienter required for civil liability (i.e., Hochfelder) was the same as for criminal liability, even though only the latter requires "willfulness" -- it might still be binding on this Court if the Second Circuit's opinion had not been reversed by the Supreme Court. 445 U.S. 1108. It is true that this aspect of the Second Circuit's opinion was not expressly overruled by the Supreme Court's decision; but the reasoning behind the reversal undercut the thrust of the Second Circuit's approach. This is because the Supreme Court held that, even though Chiarella undoubtedly knew that what he was doing was wrongful in a "mens rea" sense (-- indeed, there were written billboards at his place of business expressly warning him not to do what he did and stating that it violated the law --), what he did was not a fraud on shareholders (the theory on which the case was tried). Chiarella, 445 U.S. at 231-36. Since the Supreme Court held there was no fraud at all, it had no occasion to consider what was required for intent to defraud.

Thus, while the Second Circuit's opinion in Chiarella was technically reversed "on other grounds," the reversal was so sweeping that it is doubtful that the Second Circuit's opinion remains binding precedent in any respect here pertinent. Cf. Picard v. HSBC Bank PLC, 450 B.R. 406, 411-12 (S.D.N.Y. 2011)

21

(questioning continuing precedential force of Court of Appeal's reasoning where Supreme Court's reversal broadly undercuts the lower court's approach). Other than the reversed Second Circuit opinion in Chiarella, no other Second Circuit case is directly on point and most are concerned with the requisite intent in non-insider-trading situations or with negating any suggestion that specific intent requires an intent to violate a particular statute or rule. See United States v. Kaiser, 609 F.3d 556, 568-70 (2d Cir. 2010) and cases there discussed. Accordingly, the Court deems itself free to consider the issue de novo and, for the reasons already given, to conclude that criminal violation of subsection (a) of Rule 10b-5 is a specific intent offense.

It remains to determine what "specific intent to defraud" means in the context of such a case. Whereas in a case like Texas Gulf Sulphur it would mean an intent to harm shareholders, in a misappropriation case it would mean an intent to harm one's employer. A modified-Dirks-like case, such as this one, may have aspects of both; but the heart of the fraud is the breach of the duty of confidentiality owed to both the company and its shareholders, and accordingly the specific intent to defraud must mean, in this context, an intent to deprive the company and its shareholders of the confidentiality of its material nonpublic information.

22

For the foregoing reasons, the Court, in charging the jury in this case, concluded that the answers to the questions posed at the charging conference were as follows:

(1) The scope of an employee's duty to keep material non-public information confidential is defined by federal common law, which imposes a uniform duty on all insiders to maintain the confidentiality of material nonpublic information entrusted to them as part of a relationship of trust and confidence and not to exploit it for personal benefit.

(2) To be held criminally liable, a tippee like Mr. Whitman must have a general understanding that the inside information was obtained from an insider who breached a duty of confidentiality in exchange for some personal benefit, although the tippee need not know the details of the breach or the specific benefit the insider received or anticipated receiving.

(3) To be held criminally liable in a Dirks-like case, a tippee like Mr. Whitman must have a specific intent to defraud the company to which the information relates (and, indirectly, its shareholders) of the confidentiality of that information.

_____
JED S. RAKOFF, U.S.D.J.

Dated:    New York, New York
          November 14, 2012

23